# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

CHRISTIAN M. DEJOHN,            )
                               )
    Plaintiff,             )
                               )
vs.                            )   Case No._____
                               )
TEMPLE UNIVERSITY; DAVID        )
ADAMANY, President of Temple    )   **JURY TRIAL REQUESTED**
University, in his individual and official )
capacity; RICHARD H. IMMERMAN,  )
in his individual and official capacity; )
GREGORY J. W. URWIN, in his     )
individual and official capacity, )
                               )
    Defendants.            )

## VERIFIED COMPLAINT

Plaintiff Christian M. DeJohn ("DeJohn"), by and through counsel, and for his Complaint against Defendants, Temple University (the "University), David Adamany, Richard H. Immerman, and Gregory J. W. Urwin, states as follows:

## INTRODUCTION

1.    Temple University is one of Pennsylvania's three public research universities and claims to be a national center of teaching excellence. Students who matriculate the University are promised a forum where they can examine ideas from many points of view. For these reasons, Christian DeJohn enrolled in the University's Master of Arts in Military and American History program. However, DeJohn did not know that the university he entered would not only reject his viewpoints but would engage in a campaign of retribution and retaliation that would actively thwart his ability to complete his graduate degree. After DeJohn, a sergeant in the Pennsylvania National Guard who was deployed to Bosnia shortly after 9/11, expressed displeasure with anti-war e-mails from Defendant Richard H. Immerman DeJohn received while

engaged in hazardous duty overseas, the Defendants engaged in a series of unlawful, retaliatory acts. Defendants failed to grant DeJohn military leave guaranteed by federal and state law, dismissed him from school (later claiming his dismissal was a "computer error"), refused to advise him during his thesis completion, personally and professionally denigrated him when evaluating his thesis, rejected his thesis without legitimate academic grounds, delayed his graduation three times, caused him to default on his student loans, and conspired to deny him the same rights of other graduate students. Defendants have prevented DeJohn from graduating from his master's program and his ability to obtain employment has been significantly damaged.

2.     In addition to engaging in a highly personal campaign of retribution and retaliation against DeJohn, the University is violating the free speech and associational rights of each and every student on campus through a speech code policy that is vague, overbroad, and suppresses the discussion of controversial viewpoints. This code is enforced in part through a system of reporting that encourages students to inform on their fellow students whenever those students utter words or engage in actions deemed subjectively "harassing."

3.     With this suit, Plaintiff Christian M. DeJohn seeks compensatory and punitive damages for Defendants' actions of retaliation, discrimination, breach of contract and tortious interference with contract. In addition, DeJohn seeks injunctive relief against the policies that chill his own speech and limit his rights to free association and seeks damages caused by the university's impermissible closure of the "marketplace of ideas."

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985 and 1988.

5.      This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that Defendants reside in this district and virtually all of the acts described in this Complaint occurred in this district.

## PLAINTIFF

7.      Plaintiff Christian DeJohn ("DeJohn") is an adult graduate student pursuing a master's degree in military and American history at the University.

## DEFENDANTS

8.      Defendant Temple University is a public university organized and existing under the laws of the Commonwealth of Pennsylvania.

9.      Defendant David Adamany is the President of Temple University, a public university organized and existing under the laws of the Commonwealth of Pennsylvania.

10.     Defendant Richard H. Immerman is a Professor of Temple University's Department of History, a public university organized and existing under the laws of the Commonwealth of Pennsylvania.

11.     Defendant Gregory J. W. Urwin is a Professor of Temple University's Department of History, a public university organized and existing under the laws of the Commonwealth of Pennsylvania.

## FACTUAL BACKGROUND

### A.  Dismissal of DeJohn from His Graduate Degree Program

12.     DeJohn is a decorated veteran of the United States Army, and is presently a Sergeant in the Pennsylvania Army National Guard.

13.     Since September 11, 2001, the Army has called DeJohn to active duty several times, causing him to serve overseas in Germany, Bosnia-Herzegovina, and Egypt.

14.     In January, 2002, DeJohn entered the University's Graduate School to pursue a Master's in Military and American History (hereinafter referred to as "Graduate Degree").

15.     The University's Mission Statement purports to ensure equal treatment for all matriculating students.  The Mission Statement contains the following promise:

> Temple's talented faculty and its broad curriculum of nearly 300 academic programs provide superior educational opportunities for academically talented and highly motivated students, without regard to their status or station in life.
>
> …
>
> Striving to fulfill its mission in this new century, Temple will continue to provide access to superior education for committed and capable students of all backgrounds.

A copy of the University's Mission Statement is attached as Exhibit A to this Complaint.

16.     The University's Student Code of Conduct similarly purports to ensure equal treatment for all matriculating students, stating in relevant part:  "Temple University is a community of scholars in which freedom of inquiry and freedom of expression are valued."  A copy of the University's Student Code of Conduct is attached as Exhibit B to this Complaint.

17.     The University's History Department Graduate Bulletin also claims to ensure that students will receive equal treatment.  The Graduate Bulletin contains the following:

> Temple University offers a varied and flexible program for graduate training in history on the M.A. level.  While general requirements ensure that every Temple graduate is familiar with the basic issues of history and the latest approaches of professional historians, students are encouraged to tailor their programs to their own particular interests.
>
> …
>
> Time Limit for Degree Completion: 3 years.

A copy of the University's History Department Graduate Bulletin is attached as Exhibit C to this Complaint.

18.     Prior to enrolling, on June 19, 2001, DeJohn sent an e-mail to Gregory J. W. Urwin, a professor in the History Department, and asked him about the University's master's degree in military history.  Urwin responded on June 25, 2001, and wrote that DeJohn possesses an impressive background and encouraged him to apply for the University's graduate program. Urwin further commented that DeJohn's experience as a military history re-enactor and real military service provided him with technical knowledge and empathy for the common solider. Urwin praised DeJohn's writing experience and commented that DeJohn would make a first-rate professional military historian.  A copy of DeJohn's June 19, 2001 e-mail and Urwin's June 25, 2001 e-mail is attached as Exhibit D to this Complaint.

19.     In reliance upon all these promises, DeJohn matriculated the University in pursuit of his Graduate Degree.

20.     DeJohn has financed his Graduate Degree through federally insured student loans provided by American Education Services.  As an honorably discharged Army veteran of active duty, and as a presently serving non-commissioned officer in good-standing in the Pennsylvania Army National Guard, DeJohn is using his federal GI Bill and Commonwealth of Pennsylvania Education Assistance Program benefits.

21.     The University Graduate School initially assigned Urwin as DeJohn's interim Graduate Degree advisor.

22.     DeJohn completed the Spring 2002 semester after taking four (4) courses totaling (12) credits toward his Graduate Degree.

23.     Shortly after he completed the Spring 2002 semester at the University, the Army ordered DeJohn to active duty in the 28th Infantry Division.

24.     Upon notification by the Army, DeJohn promptly requested that the University grant him an emergency leave of absence from his Graduate Degree pursuant to the Soldiers' and Sailors' Civil Relief Act of 1940, as amended 50 U.S.C. Appendix 501 *et seq*.  In accordance therewith, on May 22, 2002, DeJohn submitted a letter to Joanne Folmer, Graduate Secretary, Department of History, requesting educational leave without penalty or loss of credits, and reserving his right to re-enroll upon his return from active military service.  A copy of DeJohn's May 22, 2002 letter to Joanne Folmer is attached as Exhibit E to this Complaint.

25.     To ensure that his educational records were updated and accurate, DeJohn sent a duplicate letter via U.S. mail and facsimile to University officials while he was serving on active duty at Fort Indiantown Gap and Fort Dix.

26.     While serving overseas from July, 2002 to March, 2003, DeJohn received History Department e-mails through the History Department's "listserv."  Many of these e-mails were written by the Chair of the History Department, Defendant Richard H. Immerman in his individual capacity.

27.     Although DeJohn believed these would be supportive e-mails from his University and colleagues, the e-mails were full of anti-war messages, information about campus "sit-ins," and demonstrations around campus protesting the Iraq war.

28.     DeJohn responded to Immerman's e-mails by informing him and the History Department that while it was promoting anti-war demonstrations, several active duty University graduate students were risking their lives overseas.  DeJohn described, in detail, the difficult conditions in which the soldiers were serving and why it was inappropriate for the University to

send such e-mails to University students serving overseas.  DeJohn also asked what actions the University and the History Department were taking to support not only University students on active duty, but also their families left behind.  DeJohn asked if the University was holding rallies or showing support for those who waited at home for University student to return from war.

29.     DeJohn received no answer from Immerman or other History Department faculty or staff explaining these e-mails.  However, after he responded to these sit-in e-mails, DeJohn stopped receiving History Department e-mail correspondence.

30.     While overseas, DeJohn sought to take a graduate-level correspondence course.  DeJohn e-mailed Urwin for permission to take this class and receive credit.  Urwin contended that several of the courses DeJohn proposed were inadequate.  However, after much debate between the DeJohn and Urwin, Urwin approved a course on the Vietnam War.  DeJohn took this course from September, 2002 to December, 2002, in addition to his regular military duties.

31.     The correspondence course was taught by Dr. Richard Hunt of American Military University.  American Military University is an accredited university and enables students who wish to use their GI Bill monetary aid on active duty.

32.     Dr. Hunt is a retired Army Colonel, who served on the personal staff of General William Westmoreland, the commander of the all the American forces during Vietnam.  The course involved rigorous reading and assignments.  DeJohn received an "A-" grade in the course.

33.     During his service overseas, the History Department issued newsletters, entitled "Strategic Visions," through the Center for the Study of Force and Diplomacy.  These newsletters contained articles about History Department students and alumni.  In the September 2002 and Spring 2003 editions of Strategic Visions, this History Department featured articles

about DeJohn's achievements while serving on active duty under hazardous conditions and in constant danger overseas.  Immerman is the director of the Center for the Study of Force and Diplomacy.

34.     DeJohn returned from his military service overseas in April, 2003.

35.     Upon his return, DeJohn received a letter dated June 17, 2003, from Margaret M. Pippet, Director of Graduate Records at the University, stating that after reviewing the University's enrollment records, she determined that DeJohn had not maintained continuous enrollment, and had not received a leave of absence from the University.  Thus, she and the University determined that DeJohn was not a student in good standing and dismissed him from the University.  A copy of Margaret M. Pippet's June 17, 2003 letter to DeJohn is attached as Exhibit F to this Complaint.

36.     Upon his return, DeJohn was unable to register for Fall 2003 classes. Accordingly, on or about June 23, 2003, DeJohn wrote to Debbie Thomas, Graduate Secretary in the History Department, and to Immerman, and other University officials, about Pippet's letter dismissing him from the University, and his inability to register for classes.  In these letters, DeJohn attempted to correct the false information leading to his dismissal from the University. A copy of DeJohn's June 23, 2003 letters to Debbie Thomas and the University officials is attached as Exhibit G to this Complaint.

37.     Immerman responded to DeJohn's letter with an e-mail stating that DeJohn should not have "gone over his [Immerman's] head" in contacting university officials about his problem.

38.     The University Provost also responded to DeJohn's open letter.   The Provost claimed that DeJohn's dismissal was a data entry or computer error, and that the problem would be corrected.

39.     DeJohn eventually resumed his Graduate Degree course and thesis work in the Fall of 2003.   One of the courses DeJohn took, Comparative History of Modern War, was taught by Urwin.   During this course Urwin consistently engaged in diatribes against the United States military in Iraq and the alleged failures of President Bush.   As a veteran, DeJohn politely disagreed with many of Urwin's characterizations.   DeJohn's disagreements were in no way disruptive to the classroom environment.

40.     During the Fall, 2003 semester, DeJohn also sought credit from the University for the Vietnam War course he took while serving overseas.   To get credit, he filled out a Request for Transfer of Graduate Credit, which Urwin was required to approve.   Although Urwin previously approved the course, when Urwin received DeJohn's Request, he questioned the validity of the course and the academic qualifications of the professor.

41.     Before approving DeJohn's request for transfer of credit, Urwin insisted that DeJohn read and review five to six (5-6) more books on the Vietnam War and submit papers discussing these books.   This amounted to DeJohn repeating the correspondence course in its entirety.   DeJohn complied with Urwin's requirement and received credit after he submitted the papers.

42.     While DeJohn took classes in the Fall, 2003 semester, he began work on his Graduate Degree thesis.   He decided to write about the United States' use of tanks in World War II.   As a tank gunner in the armed services, an interest in this topic came naturally to DeJohn.

Moreover, DeJohn's interim advisor, Urwin, who was assigned by the History Department, focuses much of studies on World War II.

43.   Moreover, according to the History Department's Graduate Handbook, after completing two (2) semesters of coursework, DeJohn was required to select a permanent thesis advisor.  Urwin was the most appropriate selection, as he was already DeJohn's interim advisor and was reasonably well-versed in DeJohn's topic area.   A copy of the History Department's Graduate Handbook is attached as Exhibit H to this Complaint.

44.   However, in December of 2003, DeJohn received an e-mail from Urwin stating that he could no longer advise DeJohn on his thesis because he was too busy.  DeJohn was left without a thesis advisor.

45.   During December of 2003, DeJohn met with Professor Nguyen Thi Dieu, the Master's degree coordinator.  Dieu confirmed that DeJohn had completed all his course work for his degree, and that his thesis should be formalized and started.

46.   However, Dieu found it highly unusual and impermissible that Urwin would assign additional course work, tantamount to a second course, for DeJohn's correspondence course in which he earned an "A-" grade.

47.   DeJohn also informed Dieu of Urwin's refusal to serve as his thesis advisor.  Dieu disapproved of Urwin's actions and recommended that DeJohn contact Professor Jay B. Lockenour, who could serve as an informal, unofficial advisor, even though he had a different area of expertise than DeJohn's thesis topic.

48.   On January 2, 2004, DeJohn sent an e-mail to Lockenour asking whether he would be willing to mentor DeJohn on his thesis.  Lockenour replied on or about January 5, 2004, and said that he would be willing to talk with DeJohn about his thesis and provide

guidance.  A copy of DeJohn's January 2, 2004 letter and Lockenour's January 5, 2004 response is attached as Exhibit I to this Complaint.

49.     DeJohn worked on his thesis over the course of the next seven (7) months.

50.     On August 10, 2004, DeJohn wrote Lockenour an e-mail on the status of his thesis, and requested a meeting to discuss his progress.  On August 13, 2004, Lockenour replied to DeJohn's e-mail and requested a copy of the thesis before he and DeJohn met in person. DeJohn submitted his thesis for comment.  A copy of DeJohn's August 10, 2004 letter and Lockenour's August 13, 2004 response is attached as Exhibit J to this Complaint.

51.     On February 3, 2005, DeJohn sent an e-mail to Lockenour informing the professor that his thesis was ready for Lockenour's primary review.  DeJohn also informed Lockenour that he intended to apply for graduation status so that he could graduate in May, 2005.  On February 9, 2005, Lockenour replied to DeJohn's e-mail and confirmed that DeJohn should apply for graduation and that DeJohn should submit his thesis as soon as possible.  A copy of DeJohn's February 3, 2005 e-mail and Lockenour's February 9, 2005 response is attached as Exhibit K to this Complaint.

52.     DeJohn immediately registered to graduate in May, 2005 and paid the mandatory registration fee.  However, the History Department informed DeJohn that he could not graduate in May, 2005 because he missed a deadline in registering to graduate.  A copy of DeJohn's Application for Graduation for Master's Degree is attached as Exhibit L to this Complaint.

53.     DeJohn edited and refined his thesis for a few months pursuant to Lockenour's comments and suggestions.  However, Lockenour only met with DeJohn once during those months to discuss the thesis.  Finally, on August 10, 2005, Lockenour e-mailed DeJohn stating that he approved DeJohn's thesis.  Lockenour instructed DeJohn to make a few minor changes

then submit a paper copy of the thesis to Urwin, who was the secondary reader.   A copy of Lockenour's August 10, 2005 e-mail is attached as Exhibit M to this Complaint.

54.     DeJohn submitted his thesis to Urwin for a secondary reading.   On or about September 10, 2005, Urwin wrote Lockenour a letter regarding DeJohn's thesis.   Urwin condemned DeJohn's thesis as "naïve" and "juvenile."   Urwin also commented that the thesis was "agonizing" and that DeJohn must suffer from "Alzheimer's disease."   Urwin also wrote notes in the margins of DeJohn's thesis.   He wrote that DeJohn sounds like a "crackpot," that his arguments are "absurd," that the thesis read like "a comic book for 5-year olds," that it was "amateurish," that it was "exaggerated melodrama," "juvenile melodrama," and "juvenile rhetoric," "monotonous agony," "juvenile argumentation," a "hissy fit in print," that DeJohn "spew[es] out words without thinking," and that "until [DeJohn] learn[s] to think, [he] will never be a historian."   Copies of Urwin's September 10, 2005 letter and his margin comments on DeJohn's thesis are attached as Exhibit N to this Complaint.

55.     DeJohn is an accomplished writer, having written articles for numerous journals and newspapers.   He has written multiple articles for the *Washington Times* and has been recognized for the outstanding quality of his written work.   Further, DeJohn has received the highest rating in previous applications for employment has a historian.

56.     With no knowledge of Urwin's unprofessional comments about his thesis, on September 11, 2005, DeJohn e-mailed Lockenour and Urwin about his thesis.   In the e-mail DeJohn indicated that postal records showed Urwin received the thesis on August 20, 2005. DeJohn also informed the professors that the Army had recalled him to active duty for overseas military training in the Middle East.   DeJohn asked if he could provide Urwin with any further documentation before he left for training and asked what he could do to speed up the secondary

reading.  A copy of DeJohn's September 11, 2005 e-mail is attached as Exhibit O to this Complaint.

57.     DeJohn returned to the United States in October, 2005 and resumed his Graduate Degree at the University.  At that time, on information and belief, Lockenour responded to DeJohn and made him aware of Urwin's comments.

58.     On October 27, 2005, DeJohn received a letter from American Education Services ("AES") indicating that because he was scheduled to graduate in May, 2005, his loans had entered the repayment period.  DeJohn was not aware of the repayment period until receipt of AES's letter.  The letter said that because DeJohn had not made any payments DeJohn failed to honor the obligation on his Federal Family Education Loan Program ("FEFLP") and if he did not correct the situation by making payments or requesting forbearance he would be in default.  The letter also stated the default would result in immediate full collection of the loan balance and a nineteen percent (19%) collection fee, increasing the amount to be repaid by approximately $7,000.00.  A copy of AES's October 27, 2005 letter is attached as Exhibit P to this Complaint.

59.     On information and belief, AES reported DeJohn's default on the student loans to the credit bureaus, causing damage to DeJohn's credit rating.

60.     AES sent DeJohn another letter on November 12, 2005 stating that he was no longer eligible for a reduced interest rate due to a delinquent installment payment.  A copy of AES's November 12, 2005 letter is attached as Exhibit Q to this Complaint.

61.     Once Lockenour informed DeJohn of Urwin's comments and unwillingness to approve DeJohn's thesis, DeJohn again contacted University officials.  On or about October 26, 2005, DeJohn wrote a letter to Defendant Adamany informing him about the problems DeJohn encountered since he started his Graduate Degree.  DeJohn described the anti-war e-mails from

Immerman, being dismissed while serving overseas, AES reporting that his loans were in default, the eight (8) month delay in getting his thesis approved, and the delay of his graduation three (3) times.

62.     On November 8, 2005, Defendant Adamany responded by letter stating that the University had done nothing wrong, but that he would refer the matter to Philip Alperson, Acting Dean of the College of Liberal Arts and Ira Schwartz, the University's Provost and Chief Academic Officer.  A copy of Defendant Adamany's November 8, 2005 response is attached as Exhibit R to this Complaint.

63.     On November 11, 2005 DeJohn sent a letter to Acting Dean Alperson and Adam Michaels in Defendant Adamany's office.  The letters reflected the same concerns expressed to Defendant Adamany and requested a meeting with Acting Dean Alperson, Immerman, Urwin and Lockenour to resolve the delay in DeJohn's graduation and compilation of problems.  Copies of DeJohn's November 11, 2005 letters are attached as Exhibit S to this Complaint.

64.     On information and belief, DeJohn met with Acting Dean Alperson, Immerman, Urwin and Lockenour on November 18, 2005.  At the meeting, these individuals and agents of the University refused to address DeJohn's concerns about the delay in his graduation, his student loans, and the comments written by Urwin regarding DeJohn's thesis.

65.     Instead, the University officials, including Urwin, required that DeJohn read seven (7) more books and write an essay on them.  They required that DeJohn stop working on his thesis until the books were read and the essay submitted.  Additionally, these University officials required that DeJohn submit a one-page document describing the argument of his thesis.  Defendant Lockenour described these requirements in a November 18, 2005 e-mail to DeJohn.  A copy of Lockenour's November 18, 2005 e-mail is attached as Exhibit T to this Complaint.

66.     DeJohn informed Lockenour once he completed these tasks on November 28, 2005.  On December 2, 2005, Lockenour wrote an e-mail to DeJohn instructing him to rewrite his thesis.  Copies of DeJohn's November 28, 2005 and Lockenour's December 2, 2005 letters are attached as Exhibit U to this Complaint.

67.     On information and believe, the University's Student Handbook indicates that the Graduate School must assign every graduate student an advisor to assist the student in completing his or her Graduate Degree and thesis.  The History Department never assigned DeJohn an advisor.

68.     The lack of a Master's degree has hampered DeJohn's ability to obtain a job as a professional historian.  Without his Graduate Degree from the University he is unable to accept employment.

69.     Presently, DeJohn has completed all the required courses and credits (26) necessary for his Graduate Degree.  However, University officials refuse to either approve or provide assistance with his Master's thesis.  As a result, DeJohn's graduation date has been delayed three times.

70.     On information and belief, University officials typically take between one and three (1-3) months to review and grant final approval to a Graduate Degree thesis.

71.     At this time DeJohn's thesis has not been approved by Urwin, Immerman and the University.

## B.  The University's Speech Code

72.     Student life for all students at the University is governed in part by the Policies and Procedures Manual ("Manual"), which contains subsections on the Student Code of Conduct and the Temple University Policy on Sexual Harassment.   This document contains

comprehensive student conduct guidelines that regulate the bounds of permissible speech and expression on campus and regulate the conduct of expressive student organizations.   This Manual will be referred to throughout this Complaint as the University's "speech policies."

73.   The University's Manual and Code of Conduct purports to prohibit "sexual harassment."   These documents are supplemented by the University's Tuttleman Counseling Services policies.   Copies of the relevant portions of the University's Manual are attached as Exhibit V to this Complaint.

74.   The University's Tuttleman Counseling Services defines "behaviors" that constitute sexual harassment.   Upon information and belief, Tuttleman Counseling Services is often the first point of contact for students who have concerns about sexual harassment.   The counseling service informs students that "[t]o understand what is sexual harassment and what you can do if you are harassed, please see below."   The Tuttleman Counseling Services website contains the following statement:

> What behaviors constitute sexual harassment?
>
> **Gender Harassment:** Generalized sexist remarks and behavior, not necessarily designed to elicit sexual cooperation, but that convey insulting, degrading or sexist attitudes about women and men.
>
> **Seductive Behavior:** Sexual advances that are inappropriate, unwanted, or offensive but that are not linked to any job-related outcomes.
>
> **Sexual Bribery:** Solicitation of sexual activity or other sex-linked behavior by promise of rewards.
>
> **Sexual Coercion:** Coercion of sexual activity by threat of punishment for non-cooperation.
>
> **Sexual Imposition:** Gross sexual behavior or assault.

A copy of the relevant portions of the University's Tuttleman Counseling Services webpage is attached as Exhibit W to this Complaint.

75.     The University's Student Code of Conduct makes it clear that students are "expected to conduct themselves in a manner in which they neither break laws nor cause mental, physical, or emotional harm to others."   Violation of the University's policies may result in expulsion, suspension, sanction, or other penalty.

76.     The University' Student Code of Conduct also mandates that all students:

1.   Foster an environment conducive to continued intellectual and educational stimulation within the University free from harassment by other members of the community; and

2.   Foster the maintenance of the physical and mental health, the safety and welfare of each member of the community; and

3.   Respect the rights of others.

Copies of the relevant portions of the University's Student Code of Conduct are attached as Exhibit X to this Complaint.

### C.  The Effect of the University's Actions on Plaintiff's Graduate Degree.

77.     Because of the University's actions in ostracizing Plaintiff based upon his veteran and political status, dismissing him from the University, failing to provide him with a permanent advisor, lodging unprofessional and derogatory comments about his abilities and thesis, and requiring him to rewrite his thesis, Plaintiff cannot obtain his Graduate Degree, cannot seek permanent employment as a military historian, has involuntarily defaulted on his student loans, and has damaged credit.

78.     The University's actions have a chilling effect on Plaintiff's rights to freely and openly express his theories, ideas and political beliefs in a manner protected by Temple policy, state law, and by the Constitution of the United States.   By engaging in these actions, the University and Defendants have violated rights guaranteed to Plaintiff by the First and Fourteenth Amendments to the Constitution of the United States, and have violated Pennsylvania

common law governing contractual relationships.  These rights and laws are clearly established by governing legal authority, and Defendants' violations are knowing, intentional and without justification.

79.     The purposeful and knowing actions of the University and Defendants Adamany, Immerman, and Urwin constitute illegal retaliation against Plaintiff for engaging in protected speech.  These actions are illegal under the Free Speech clause of the First Amendment.  So long as these actions continue to go unpunished, the University is causing ongoing and irreparable harm to the Plaintiff.

80.     The purposeful and knowing actions of the University and Defendants Adamany, Immerman, and Urwin constitute discrimination based on Plaintiff's veteran and political status. These actions are unconstitutional under the Equal Protection clause of the Fourteenth Amendment.  So long as these actions continue to go unpunished, the University is causing ongoing and irreparable harm to the Plaintiff.

81.     The purposeful and knowing actions of the University and Defendants Adamany, Immerman, and Urwin constitute a conspiracy to discriminate against Plaintiff based on veteran status and political status.  These actions are illegal under 42 U.S.C. §§ 1985 & 1986 and the Equal Protection clause of the Fourteenth Amendment.  So long as these actions continue to go unpunished, the University is causing ongoing and irreparable harm to the Plaintiff.

82.     The purposeful and knowing actions of the University and Defendants Adamany, Immerman, and Urwin caused Plaintiff to detrimentally rely on their promises to provide a forum for academic freedom and assist him in pursuit of his Graduate Degree.  These actions are illegal under Pennsylvania's common law doctrine of promissory estoppel.  So long as these actions

continue to go unpunished, the University is causing ongoing and irreparable harm to the Plaintiff.

83.      The purposeful and knowing actions of the University and Defendants Adamany, Immerman, and Urwin breached Plaintiff's contractual obligations with American Education Services.  These actions constitute tortuous interference with Plaintiff's contractual relations under Pennsylvania's common law.  So long as these actions continue to go unpunished, the University is causing ongoing and irreparable harm to the Plaintiff.

### D.  The Effect of the University's Speech Codes on Plaintiff.

84.      Because of the University's onerous speech codes and intolerance of any students who dissent from its orthodoxy on matters relating to—among other things—gender politics and sexual morality, Plaintiff cannot engage in the full range of dialogue on matters of political, cultural, and religious importance.

85.      Plaintiff is a History graduate student and finds himself consistently engaged in conversations and class discussions regarding issues implicated by the speech codes and Plaintiff fears that the discussion of his social, cultural, political and/or religious views regarding these issues may be sanctionable under applicable University speech codes.

86.      The University's speech codes contained in the Manual, Student Code of Conduct, and Tuttleman Counseling Services webpage have a chilling effect on Plaintiff's rights to freely and openly engage in appropriate discussions of his theories, ideas and political and/or religious beliefs.  By adopting these speech codes, the University and Defendant Adamany have violated rights guaranteed to Plaintiff—and to all University students—by the First and Fourteenth Amendments to the Constitution of the United States of America.  These rights are

clearly established by governing legal authority, and Defendants' violations are knowing, intentional and without justification.

87.     The speech codes outlined above are vague, overbroad, discriminate on the basis of religious and/or political viewpoint, interfere with the right of free association, impose unconstitutional conditions on the receipt of state benefits, and constitute an illegal prior restraint on the Plaintiff's rights of free speech and assembly.  These speech codes are therefore facially invalid under the Free Speech and Free Exercise of Religion clauses of the First Amendment and the due process and equal protection provisions of the Fourteenth Amendment.  So long as these speech codes survive, the University is causing ongoing and irreparable harm to the Plaintiff and to every student and student organization at the University.

## FIRST CAUSE OF ACTION

### First Amendment Retaliation (42 U.S.C. § 1983)

88.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 87 of this Complaint.

89.     By dismissing Plaintiff from Temple University, denigrating his personal and professional abilities in reviewing his thesis, requiring him to retake an already completed graduate correspondence course, refusing to advise him on his thesis on two occasions, delaying his graduation three times, and preventing him from obtaining the credentials necessary for employment as a professional historian, among other things, Defendants have retaliated against Plaintiff for responding to Immerman's e-mails about the United States Military, voicing his opinions on military policy in Urwin's comparative history course, and speaking on issues of academic freedom before the Pennsylvania House Select Committee.

90.     Defendants, acting under color of state law, have engaged in actions that are retaliatory and have therefore infringed Plaintiff of his clearly established free speech rights guaranteed by the First Amendment to the United States Constitution.

91.     Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.   He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

92.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Fourteenth Amendment Equal Protection (42 U.S.C. § 1983)

93.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 92 of this Complaint.

94.     By dismissing Plaintiff from Temple University, denigrating his personal and professional abilities in reviewing his thesis, requiring him to retake an already completed graduate correspondence course, refusing to advise him on his thesis on two occasions, failing to provide him with a permanent thesis advisor, delaying his graduation three times, preventing him from obtaining employment as a professional historian, and incorrectly notifying American Education Services that he had graduated, among other things, Defendants have treated Plaintiff differently than similarly situated graduate students and have done so because of DeJohn's status as a veteran and because of DeJohn's constitutionally protected speech activities.

95.    Defendants, acting under color of state law, have engaged in actions that are discriminatory and have therefore deprived Plaintiff of his clearly established equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.

96.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore is entitled to an award of monetary damages, including punitive damages, and equitable relief.

97.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

### Conspiracy to Violate Civil Rights (42 U.S.C. §§ 1985 & 1986)

98.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 97 of this Complaint.

99.    By dismissing Plaintiff from Temple University, denigrating his personal and professional abilities in reviewing his thesis, requiring him to retake an already completed graduate correspondence course, refusing to advise him on his thesis on two occasions, failing to provide him with a permanent thesis advisor, delaying his graduation three times, preventing him from obtaining employment as a professional historian, and notifying American Education Services of his false graduation, among other things, Defendants, acting outside the scope of their employment, but in conspiracy with University officials, have conspired to treat Plaintiff differently than similarly situated graduate students and have done so because of DeJohn's status as a veteran and because of DeJohn's constitutionally protected speech activities.

100.    Defendants, acting individually and under color of state law, have conspired to discriminate against Plaintiff and have therefore deprived Plaintiff of his clearly established equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.

101.    Because of Defendants actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages against the Defendants in their individual capacities for their outrageous actions against DeJohn, and equitable relief.

102.    Pursuant to 42 U.S.C. §§ 1985, 1986 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**

**<u>Breach of Contract—Promissory Estoppel</u>**

103.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 102 of this Complaint.

104.    By promising to provide a forum of academic freedom where Plaintiff can pursue his Graduate Degree from without regard to his underlying political viewpoints, by promising to treat Plaintiff equally to all graduate students, Defendants have caused Plaintiff to enroll in the University and detrimentally rely upon the University's promises of a graduate education.

105.    Defendants, acting individually and collectively, have caused Plaintiff to detrimentally rely upon their promise of a graduate education and have therefore deprived Plaintiff of his clearly established legal rights under Pennsylvania common law.

106.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore is entitled to an award of monetary damages and equitable relief.

107.    Plaintiff is entitled to an award of monetary damages in an amount to be determined by this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION

### Tortious Interference with Contractual Relations

108.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 107 of this Complaint.

109.    By falsely notifying American Education Services of Plaintiff's graduation, Defendants have, without privilege or justification, interfered with Plaintiff's contractual relationship with American Education Services.

110.    Defendants, acting individually and collectively, have caused American Education Services to require Plaintiff to prematurely repay his student loans, causing damage to Plaintiff's credit score, and have therefore deprived Plaintiff of his clearly established legal rights under Pennsylvania common law.

111.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages against the Defendants in their individual capacities for their outrageous actions against DeJohn, and equitable relief.

112.    Plaintiff is entitled to injunctive relief and an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

### Violation of Educational Leave of Absence Statute (51 Pa. C.S.A. § 7313)

113.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 112 of this Complaint.

114.    By dismissing Plaintiff from the University during his military service and by delaying Plaintiff's graduation date, Defendants have not maintained Plaintiff's enrollment status despite his absence from classes due to military service.

115.    Defendants, acting individually and collectively, have delayed Plaintiff's graduation, causing delay to Plaintiff's search for permanent employment, and have therefore deprived Plaintiff of his clearly established legal and equitable rights under Pennsylvania common law.

116.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable injury which cannot be fully compensated by an award of money damages.

117.    Plaintiff is further entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION

### Violation of Plaintiff's Rights to Freedom of Expression and Due Process of Law (42 U.S.C. § 1983)

118.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 117 of this Complaint.

119.    By prohibiting, among other things, "generalized sexist remarks" or conduct that "implies a discriminatory hostility toward their personal or professional interests because of their sex," and by defining "behaviors that constitute sexual harassment" in a manner that is both vague and overbroad, Defendants have conditioned compliance with University speech codes on the subjective emotional experience of the listener and have enacted regulations that limit and prohibit speech without providing any objective guidelines by which Plaintiff can guide his behavior.

120.    Defendants, acting under color of state law, have enacted regulations that deprive Plaintiff of his clearly established due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

121.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable injury which cannot be fully compensated by an award of money damages.

122.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a preliminary and permanent injunction invalidating and restraining enforcement of the University's speech restrictive Policy Manual and Student Guide and other speech-restrictive policies.  Additionally, Plaintiff is entitled to damages in an amount to be determined by the Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION

### Violation of Plaintiff's First Amendment Right to Freedom of Expression (42 U.S.C. § 1983)

123.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 122 of this Complaint.

124.    By prohibiting, among other things, "generalized sexist remarks" or conduct that "implies a discriminatory hostility toward their personal or professional interests because of their sex," and by defining "behaviors that constitute sexual harassment" in a manner that is both vague and overbroad, Defendants have explicitly and implicitly discriminated on the basis of viewpoint and deprived Plaintiff of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

125.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable injury which cannot be fully compensated by an award of money damages.

126.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a preliminary and permanent injunction invalidating and restraining enforcement of the University's speech restrictive Policy Manual and Student Guide and other speech-restrictive policies.  Additionally, Plaintiff is entitled to damages in an amount to be determined by the Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff Christian M. DeJohn respectfully requests that the Court enter judgment against Defendant Temple University, Defendants David Adamany, Richard H. Immerman, Gregory J. W. Urwin, and Jay B. Lockenour, and provide Plaintiff with the following relief:

(A)    Monetary damages (including punitive damages for Defendants actions in their individual capacities) for infringing against Plaintiff's exercise of his First Amendment rights;

(B)    Monetary damages (including punitive damages for Defendants actions in their individual capacities) for Defendants' preventing Plaintiff from obtaining his Graduate Degree;

(C)   Monetary damages (including punitive damages for Defendants actions in their individual capacities) for Defendants' conspiracy to prevent Plaintiff from obtaining his Graduate Degree;

(D)   A declaration stating that Plaintiff is entitled to approval of his thesis and an award of his Graduate Degree;

(E)   Monetary damages (including punitive damages for Defendants actions in their individual capacities) for Defendants' tortiously interfering with Plaintiff's student loan contract;

(F)   A preliminary and permanent injunction invalidating and restraining enforcement of the University's unconstitutional speech codes;

(G)   Monetary damages for the illegal speech codes in an amount to be determined by the Court;

(H)   Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(I)   All other further relief to which Plaintiff may be entitled.


Respectfully submitted,


_____
LEONARD G. BROWN, III
Pennsylvania Bar No. 83207
Clymer & Musser, P.C.
23 N. Lime St.
Lancaster, PA 17602
(717) 299-7101
(717) 299-5115—facsimile

DAVID A. FRENCH*
Tennessee Bar No. 16692
Kentucky Bar No. 86986
ALLIANCE DEFENSE FUND
(931) 490-0591

(931) 490-7989—facsimile

BENJAMIN W. BULL (of counsel)
DAVID J. HACKER*
Illinois Bar No. 6283022
ALLIANCE DEFENSE FUND
15333 N. Pima Rd., Suite 165
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028—facsimile

(*Pro Hac Vice motion forthcoming)

ATTORNEYS FOR PLAINTIFF

Dated: February 22, 2006

### VERIFICATION OF COMPLAINT

I, Christian M. DeJohn, a citizen of the United States and resident of Montgomery County, Pennsylvania, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Date:  February___, 2006.

_____
Christian M. DeJohn

Sworn to and subscribed before me this the _____ day of February, 2006.

_____
NOTARY PUBLIC

My commission expires:

_____